636 F.2d 1028
 81-1 USTC P 9193
 UNITED STATES of America and Edmond J. Martin, Special
Agent, Internal Revenue Service, Plaintiffs-Appellees,
v.
Craig E. DAVIS, Defendant-Appellant.
UNITED STATES of America and Edmond Martin, Special Agent,
Plaintiffs- Appellees,
v.
Stephen M. ORR, Defendant-Appellant.
 Nos. 79-2630, 80-1015.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit A
 Feb. 12, 1981.
 Charles O. Grigson, Austin, Tex., for defendants-appellants.
 Harold O. Atkinson, Asst. U. S. Atty., San Antonio, Tex., Gilbert E. Andrews, Chief, Appellate Section, Charles E. Brookhart, William A. Whitledge, Attys., Tax Div., M. Carr Ferguson, Asst. Atty. Gen., U. S. Dept. of Justice, Washington, D.C., for plaintiffs-appellees.
 Appeals from the United States District Court for the Western District of Texas.
 Before WISDOM, AINSWORTH and GEE, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 These two cases involve the validity of two civil investigative summonses issued by the Internal Revenue Service (IRS) under 26 U.S.C. § 7602. Craig Davis and Stephen Orr, the summonees, appeal from separate judgments enforcing summonses that require each to produce documents and give testimony relating to the income tax liability of their client, Robert M. Howard, for the years 1974 through 1977. We agree with the result the district court reached in most of its rulings but we disagree with the court's analysis of the attorney-client privilege as applied to Davis and Orr. We affirm in part, reverse in part, and vacate and remand in part.
 
 I.
 
 2
 The events leading up to these appeals are not seriously disputed. On April 12, 1978, IRS Special Agent Edmond Martin began gathering information about narcotics traffic in Austin, Texas, to determine whether those engaged in such illicit commerce had a least paid their just tax on income derived from that activity. From the beginning, Robert Howard figured prominently in the investigation. Parallel investigations into Texas drug traffic were simultaneously being conducted by the Federal Drug Enforcement Administration and the Attorney General of the State of Texas. From William Fargo, a member of the Texas Attorney General's office, Martin obtained information tending to implicate Howard in marijuana smuggling, and in August 1978, Fargo corroborated earlier reports that Howard controlled a corporation which owned a 79-foot yacht. Because Howard reported little or no income on his income tax returns for the years 1972 through 1976, Martin not surprisingly surmised that if those rumors had a factual basis, Howard might have had substantial unreported income in those years. The IRS therefore began a formal tax investigation of Howard on August 23.
 
 
 3
 On September 1 Fargo informed Martin that Howard had just been arrested on a drug charge and that contraband and documents had been seized in a search of Howard's residence under a search warrant. Martin accepted Fargo's invitation to inspect the documents, and made photographic and microfilm copies of some of them. Following standard IRS procedure,[1] Martin delivered the copies to his supervisor, who sealed them pending internal review of the validity of the search. Because the search warrant, by oversight, had not been signed by the issuing magistrate, the copies have remained sealed.
 
 
 4
 Agent Martin next tried to further the investigation by what has become a familiar IRS tactic: issuing summonses to the taxpayer's attorneys and accountants. On September 5, a summons was issued to Davis, an attorney and certified public accountant who had prepared Howard's tax returns for several of the years in question. The summons required Davis to produce and testify as to two categories of documents.[2] First, he was to bring all records in his possession of financial transactions by Howard or corporations in which Howard had participated for the years 1974 through 1978. Second, he was to produce the workpapers he had generated in the course of preparing Howard's tax returns for those years. At Howard's request, Davis refused to comply with any part of the summons, citing the attorney-client privilege as justification. The government filed a petition under 26 U.S.C. § 7604 to enforce the summons. After an evidentiary hearing at which Davis's counsel had an opportunity to cross-examine Martin and Fargo extensively, the district court issued an order granting the government's petition in full.
 
 
 5
 While the proceeding to enforce the summons issued to Davis was pending, the government issued two more summonses. One was issued to Howard himself. Howard appeared at Agent Martin's office in compliance with that summons on December 26, 1978, with his counsel, Orr, but did not produce any documents or answer any questions, asserting his fifth amendment privilege against self-incrimination. The government has not sought judicial enforcement of that summons, and it is not in issue in this appeal. The other summons, however, was issued to Orr, one of Davis's law partners. Orr has represented and continues to represent Howard in several criminal proceedings; Orr had represented Howard in the two earlier summons proceedings until Orr was himself summoned. The summons to Orr, issued on February 23, 1979, required him to produce fourteen categories of documents, falling into three broad classes:[3] (1) Orr's records of financial transactions between Orr and Howard, including loans, gifts, and compensation to Orr; (2) Orr's records of financial transactions between Howard and third parties, including records of the disbursement of funds to others by Orr's law firm on Howard's behalf, and records of activities in which the law firm had assisted Howard in acquiring or disposing of money and property; (3) business records created by Howard or by corporations controlled by Howard in Orr's possession. Orr, like Davis, made a blanket assertion of privilege and refused to comply with any part of the summons. The government petitioned for enforcement and after a second evidentiary hearing the district court granted the petition.
 
 
 6
 Davis and Orr separately obtained stays and each appealed. They advance overlapping arguments against enforcement of their summonses.
 
 II.
 
 7
 Both Davis and Orr assert that the government failed to meet the standards laid down in United States v. Powell, 1964, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112, for enforceability of IRS summonses under 26 U.S.C. §§ 7602(b), 7604. Under Powell, the government need not meet any standard of probable cause to obtain enforcement, but need make merely a preliminary showing that
 
 
 8
 the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the Commissioner's possession, and that the administrative steps required by the Code have been followed....
 
 
 9
 379 U.S. at 57-58, 85 S.Ct. at 254. This showing may be made by a simple affidavit filed with the petition to enforce by the agent who issued the summons, as was done in this case. United States v. McCarthy, 3 Cir. 1975, 514 F.2d 368, 372; United States v. Garden State National Bank, 3 Cir. 1979, 607 F.2d 61. Once the government has satisfied this minimal requirement, the burden shifts to the summonee either to disprove one of the four elements of the government's prima facie showing or to demonstrate that judicial enforcement of the summons would otherwise constitute an abuse of the court's process. United States v. Powell, 379 U.S. at 58, 85 S.Ct. at 255. See generally Kenerdine, The Internal Revenue Service Summons to Produce Documents: Powers, Procedures, and Taxpayer Defenses, 64 Minn.L.Rev. 73 (1979); Note, The Institutional Bad Faith Defense to the Enforcement of IRS Summonses, 80 Colum.L.Rev. 621 (1980).
 
 A.
 
 10
 Several of the appellants' arguments may be dismissed with a minimum of discussion. Davis argues both that the summons issued to him was based on information obtained in the search of Howard's residence and, more generally, that the entire IRS investigation resulted from information obtained in that search. Since the search was made under an unsigned warrant, he argues that his summons is a tainted fruit of an unlawful search. We need not consider the merits of this argument as a matter of law.[4] The district court specifically found that Davis did not meet his burden of demonstrating that the investigation or the summons was based on the fruits of the search. That finding is not clearly erroneous. Since the documents obtained by the IRS from that search were sealed and never used, they cannot be a source of taint. Martin admitted that while he was making copies of the seized documents he noticed the names of certain corporations presumably owned or controlled by Howard, but the evidence is that long before then those names and relationships were known to the IRS.
 
 
 11
 Nor is there merit to Davis's contention that the summons issued to him was unenforceably vague. Because he did not raise this contention before the trial court, it need not be considered on appeal in the absence of exceptional circumstances resulting in a miscarriage of justice. D. H. Overmyer Co. v. Loflin, 5 Cir. 1971, 440 F.2d 1213, 1215-16, cert. denied, 1971, 404 U.S. 851, 92 S.Ct. 87, 30 L.Ed.2d 90. In any case, we find that the summons issued here described the documents with sufficient particularity to inform Davis which ones should be produced. In re Grand Jury Proceedings (McCloy and Sussman), 5 Cir. 1979, 601 F.2d 162, 168; United States v. Malnik, 5 Cir. 1974, 489 F.2d 682, 686 n.4, cert. denied, 1974, 419 U.S. 826, 95 S.Ct. 44, 42 L.Ed.2d 50.[5]
 
 B.
 
 12
 Both Davis and Orr contend that the sole institutional purpose of the IRS in issuing the summonses was to aid future criminal prosecutions against Howard. Notwithstanding that the IRS has not made a recommendation for criminal prosecution to the Department of Justice and that agent Martin has not recommended criminal proceedings to his superiors, appellants offer the following as indicia of criminal purpose: the investigation was initiated by Martin, a Special Agent and therefore a member of the IRS's criminal investigation arm; Martin himself was admittedly concerned only with criminal investigation; and the revenue agent assigned to the case has to date played a purely passive role.[6] They also point to the cooperation between the IRS and state and federal drug enforcement agencies and to the IRS's attempt to summon certain of Howard's bank records from Davis and Orr rather than directly from his bank; and they allege that the IRS deliberately delayed recommending prosecution to the Department of Justice to gather more information through these summonses.
 
 
 13
 In United States v. LaSalle National Bank, 1978, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221, and Donaldson v. United States, 1971, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580, the Supreme Court established that IRS summonses may not be enforced if issued solely to gather information for a criminal prosecution. Information gathering via summons after a case is actually referred to the Department of Justice for prosecution necessarily infringes on the role of the grand jury as the principal tool of federal criminal investigation. LaSalle recognized that the same evidence will generally support either civil or criminal tax proceedings, however, and the Court did not choose to let mere potential infringement on the function of the grand jury limit the use of summonses for civil tax investigation even if criminal proceedings were also contemplated. LaSalle therefore held that summonses issued before referral are invalid only if the IRS has abandoned the pursuit of immediate civil tax collection "in an institutional sense", as "where there is an institutional commitment to make the referral and the Service merely would like to gather evidence for the prosecution". 437 U.S. at 318, 98 S.Ct. at 2368; id. at 317, 98 S.Ct. at 2368. Since the decision to refer usually takes place in the upper echelons of the IRS hierarchy after several layers of review, such an institutional abandonment would require an extraordinary departure from established procedures. 437 U.S. at 314-16, 98 S.Ct. at 2366. This Court has therefore recognized that before the investigating agent completes his investigation or makes a recommendation for criminal prosecution, summonses are "virtually unassailable". United States v. Harris, 5 Cir. 1980, 628 F.2d 875, 882, quoting United States v. Genser, 3 Cir. 1979, 595 F.2d 146, 151, cert. denied, 1979, 444 U.S. 928, 100 S.Ct. 269, 62 L.Ed.2d 185.
 
 
 14
 The question of institutional purpose is one of fact. United States v. First National Bank of Atlanta, 5 Cir. 1980, 628 F.2d 871, 874. Here the district court found that the IRS had a civil purpose for issuing each summons. None of the factors identified by the appellants persuade us that this finding is clearly erroneous. There is no direct evidence that Martin's superiors have determined against a prompt civil action against Howard for collection of back taxes the ultimate test of the IRS's institutional posture. The fact that the summonses were issued and the investigation is primarily being carried out by a special agent is of little significance. Couch v. United States, 1973, 409 U.S. 322, 326, 93 S.Ct. 611, 614, 34 L.Ed.2d 548; United States v. Amerada Hess Corp., 3 Cir. 1980, 619 F.2d 980, 985; United States v. Garden State National Bank, 3 Cir. 1979, 607 F.2d 61, 65. So too is intent of the agent who issued the summons. United States v. LaSalle National Bank, 1978, 437 U.S. 298, 316, 98 S.Ct. 2357, 2367, 57 L.Ed.2d 221. Although LaSalle indicates that unreasonable delay in recommending prosecution could show improper purpose, the record does not show unreasonable delay by Martin or his superiors. Cf. United States v. Chase Manhattan Bank, 2 Cir. 1979, 598 F.2d 321; United States v. O'Henry's Film Works, Inc., 2 Cir. 1979, 598 F.2d 313, 320. Finally, appellants cite no case, and we have found none, which suggests that the IRS's use of information obtained from other government agencies or its effort to summons bank records from parties other than the issuing bank bears in any way on its institutional purpose. The IRS can use information wherever it finds it.[7]C.
 
 
 15
 Both Davis and Orr contend that their summonses should not be enforced because the IRS already possesses some of the information requested by the summonses. The affidavits accompanying the government's petitions to enforce the summonses deny that the IRS possesses any of the summoned information. These assertions are sufficient to shift to the summonees the burden of showing, at a minimum, "actual possession of the information by the IRS." United States v. Garrett, 5 Cir. 1978, 571 F.2d 1323, 1328. The only evidence demonstrating that the government possesses any of the summoned information is Martin's admission during cross-examination at the enforcement hearing on the Orr summons that he had already received from a local bank "some" bank records that were also requested from Orr.[8] Since those records constituted only a small proportion of the documents requested by the summons, this admission would at most have been grounds for limiting enforcement of the summons to those documents not already in the IRS's possession, rather than completely denying enforcement. Orr should have requested further discovery on this point and specifically moved for partial denial of enforcement. Since Orr never clearly made such a motion, it was not error for the district court to reject his blanket argument against enforcement.
 
 
 16
 Even if Orr had specifically preserved the point, however, we hold that it would not have been error for the district court to enforce the summons in its entirety. The "already possessed by government" defense originated in the passage of United States v. Powell quoted above, for which the Supreme Court cited no authority. Powell construed not only the implicit prerequisites to enforceability of a summons issued under 26 U.S.C. §§ 7602, 7604(b), but also the explicit limitation contained in 26 U.S.C. § 7605(b), which forbids "unnecessary" summonses. Read in context, we construe the "already possessed" principle enunciated by Powell as a gloss on § 7605(b)'s prohibition of "unnecessary" summonses, rather than an absolute prohibition against the enforcement of any summons to the extent that it requests the production of information already in the possession of the IRS.
 
 
 17
 This balancing approach is supported by analogy to the principles governing the enforcement of grand jury subpoenas. The Supreme Court has frequently made reference to such an analogy in interpreting the scope of the IRS's summons power. See, e.g. United States v. Euge, 1980, 444 U.S. 707, 710, 100 S.Ct. 874, 877, 63 L.Ed.2d 141; United States v. Powell, 1964, 379 U.S. 48, 57, 85 S.Ct. 248, 254, 13 L.Ed.2d 112. But a grand jury is not absolutely prohibited from subpoenaing documents that contain information already in its possession. Its subpoenas will be enforced so long as they are not, on balance, "unreasonable or oppressive". Fed.R.Crim.P. 17(c). See In re grand Jury Subpoenas Duces Tecum (M. G. Allen & Associates, Inc.), D.R.I.1975, 391 F.Supp. 991, 1001-02; In re Columbia Broadcasting System, Inc., S.D.N.Y.1964, 235 F.Supp. 684, 688-89. See generally 8 Moore's Federal Practice P 17.11 (2d ed. 1980).
 
 
 18
 In practice, Powell's possession defense has been so applied. For example, in United States v. Schwartz, 5 Cir. 1972, 469 F.2d 977, 985, this Court held that where reference would have to be made to voluminous corporate records to locate summoned information, the IRS should not be deemed to be in possession of the information even though an IRS agent had access to inspect the information. Similarly, in United States v. First National State Bank of New Jersey, 3 Cir. 1980, 616 F.2d 668, 673-74, cert. denied, 1980, 447 U.S. 905, 100 S.Ct. 2987, 64 L.Ed.2d 854, the court enforced a summons against a third-party recordkeeper for copies of certain tax forms previously filed with the IRS because the total number of such forms in the possession of the IRS made it impracticable to retrieve those filed by any individual. Though both of these courts chose to cast their argument in terms of whether the information was effectively in the government's "possession", this terminology should not obscure their essential analysis. In both opinions the courts recognized that actual possession of or access to information by the IRS is not an absolute bar to enforcement of a summons for that information. In both the courts balanced the government's need for effective investigation against the potential for unnecessary harassment inherent in such summonses, and enforced such summonses even though compliance would impose nontrivial costs on the summonee.[9]
 
 
 19
 Just as the need to permit effective investigation may justify the IRS summoning information it already possesses, so should the need to expedite summons enforcement proceedings. Enforcement proceedings are essentially summary in nature. Donaldson v. United States, 1971, 400 U.S. 517, 529, 91 S.Ct. 534, 546, 27 L.Ed.2d 580. It is inconsistent with the scheme of summary enforcement to permit a person summoned to delay the process by the detailed discovery, prolonged cross-examination, and possible in camera inspection necessary to sort out a relatively small number of documents, the contents of which may already be known to the IRS, when it is probable that the person summoned has no substantial interest in anything but the delay itself. When a summons as a whole is not harassing, when the bulk of the materials summoned is not demonstrably in the possession of the IRS, and where the marginal burden of supplying information which might already be in the possession of the IRS is small, as was the case here, enforcement of the summons in its entirety is not an "unnecessary examination or inspection" within the meaning of § 7605(b). The "already possessed" rule should be limited to such cases as United States v. Pritchard, 5 Cir. 1971, 438 F.2d 969, where a revenue agent had informally examined the taxpayer's records at length and later sought to force their production without any explanation of why the opportunity for informal examination had been insufficient. It is not a license to trim the edges of an otherwise valid summons.
 
 III.
 
 20
 In addition to trying to disprove the prima facie enforceability of the summonses issued to them, Davis and Orr made blanket assertions concerning the attorney-client privilege, the work product doctrine, and their client's fifth amendment privilege, all of which the district court rejected. Appellants urge us to pass on all their claims of documentary privilege now and to require the government to submit its questions to the district court in advance to screen them through their claims of privilege. The government, by contrast, suggests that the summonses should have been enforced without considering any claims of privilege; it argues that all claims of privilege should be asserted on a document-by-document or question-by-question basis before the summoning officer after enforcement, who may then test the claims of privilege by instituting contempt proceedings.
 
 
 21
 It is generally agreed that the recipient of a summons properly should appear before the issuing agent and claim privileges on a question-by-question and document-by-document basis. United States v. Malnik, 5 Cir. 1974, 489 F.2d 682, 685, cert. denied, 1974, 419 U.S. 826, 95 S.Ct. 44, 42 L.Ed.2d 50; United States v. Roundtree, 5 Cir. 1969, 420 F.2d 845, 852. But if the summonee and the agent disagree on the validity of a specific claim of privilege, or if the summonee makes a blanket claim of privilege before the agent, there is a split of authority on when that claim should be judicially resolved. Some courts apparently accept the government position and do not pass on claims of privilege at all at the enforcement stage. E. g., Russell v. United States, 8 Cir. 1975, 524 F.2d 1152; United States v. Theep, 9 Cir. 1974, 502 F.2d 797. In this Circuit, the division of responsibility between the initial enforcement proceeding and later contempt proceedings for passing on claims of privilege has evolved otherwise. Claims of privilege with respect to documents may be asserted in enforcement proceedings. But privilege is not a defense to enforcement of a summons to testify; such claims are tested by refusing to answer specific questions after enforcement and defending the subsequent contempt proceeding. United States v. Hankins, 5 Cir. 1978, 565 F.2d 1344, clarified, 581 F.2d 431, cert. denied, 1979, 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457; United States v. Malnik, 5 Cir. 1974, 489 F.2d 682, cert. denied, 1974, 419 U.S. 826, 95 S.Ct. 44, 42 L.Ed.2d 50; United States v. Johnson, 5 Cir. 1972, 465 F.2d 793. See also Reisman v. Caplin, 1964, 375 U.S. 440, 449, 84 S.Ct. 508, 513, 11 L.Ed.2d 459. We therefore proceed to consider the validity of the appellants' claims of privilege with respect to the summoned documents.
 
 A.
 
 22
 Two of those claims are without merit. Appellants' attempt to assert their client's fifth amendment privilege vicariously is squarely forbidden by Couch v. United States, 1973, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548. See also Fisher v. United States, 1976, 425 U.S. 391, 397-98, 96 S.Ct. 1569, 1574, 48 L.Ed.2d 39. Couch ruled that "the Fifth Amendment privilege is a personal privilege: it adheres basically to the person, not the information that may incriminate him". 409 U.S. at 328, 93 S.Ct. at 616. The papers summoned here are within the physical possession of Davis and Orr, but the summonees do not contend that their production will in any way incriminate themselves. Hence here, as in Couch, "the ingredient of personal compulsion against an accused is lacking". 409 U.S. at 329, 93 S.Ct. at 616. Nor can the papers be said to be constructively within Howard's possession, even as to those owned by him. All the summoned documents undisputedly have been in the appellants' physical possession for months or years, and the appellants are not mere custodial bailees who have made no use of the documents and have no knowledge of their contents. See Couch v. United States, 409 U.S. at 333-35, 93 S.Ct. at 619; United States v. Jones, 5 Cir. 1980, 630 F.2d 1073.
 
 
 23
 The summonees' attempt to bring the summoned documents within the work product doctrine is similarly meritless. Without pausing to resolve the debate over whether the work product doctrine can ever apply in IRS summons proceedings,[10] it is plain here that none of the summoned documents were "materials prepared by an attorney 'acting for his client in anticipation of litigation' ". United States v. Nobles, 1975, 422 U.S. 225, 237-38, 95 S.Ct. 2160, 2169, 45 L.Ed.2d 141, quoting Hickman v. Taylor, 1947, 329 U.S. 495, 508, 67 S.Ct. 385, 392, 91 L.Ed. 451. A large proportion of the summoned documents are business records prepared by the client, rather than by or on behalf of his lawyers. Of the documents prepared by the attorneys themselves, none were even colorably prepared in anticipation of this or any other litigation except for the workpapers created by Davis in the course of preparing Howard's tax returns for the years 1974 through 1978. But papers generated by an attorney who prepares a tax return are not within the work product privilege simply because there is always a possibility that the IRS might challenge a given return. See Colton v. United States, 2 Cir. 1962, 306 F.2d 633, 639-40, cert. denied, 1963, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499. It is admittedly difficult to reduce to a neat general formula the relationship between preparation of a document and possible litigation necessary to trigger the protection of the work product doctrine. See Kent Corp. v. NLRB, 5 Cir. 1976, 530 F.2d 612, 623, cert. denied, 1976, 429 U.S. 920, 97 S.Ct. 316, 50 L.Ed.2d 287; In re Grand Jury Investigation (United States), 3 Cir. 1979, 599 F.2d 1224, 1229. We conclude that litigation need not necessarily be imminent, as some courts have suggested, see, e. g., Home Insurance Co. v. Ballenger Corp., N.D.Ga.1977, 74 F.R.D. 93, 101; In re Grand Jury Investigation (Joseph B. Sturgis), E.D.Pa.1976, 412 F.Supp. 943, 948, as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation. See Osterneck v. E. T. Barwick Industries, Inc., N.D.Ga.1979, 82 F.R.D. 81, 87, citing 8 C. Wright & A. Miller, Federal Practice and Procedure § 2024, at 198 (1970). But there is no evidence that Davis had reason to expect future trouble with the IRS. Davis's workpapers were to aid in preparing tax returns, not primarily to help litigate over those returns. They are therefore outside the scope of the work product doctrine.
 
 B.
 
 24
 Finally, both Davis and Orr contend that the requested documents are protected by the attorney-client privilege. The district court properly looked to Fisher v. United States, 1976, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39, to provide the structure for analysis of this contention. Fisher involved an attempt by the IRS to summon from a taxpayer's attorney workpapers produced by the independent accountant who had prepared the tax returns. The Court held that preexisting documents transferred to an attorney are protected by the attorney-client privilege only if two conditions are met. First, the usual common-law prerequisites for the privilege must be satisfied: the information in the documents must be confidential and the transfer must have been made to obtain legal advice. Second, the documents must have been privileged from production in the client's hands, either at common law or under the fifth amendment. In Fisher, as in this case, the only potentially applicable privilege derives from the fifth amendment. The district court here applied this two-pronged test to all of the summoned documents. Without examining them, the court found that none could reflect "testimonial communications" by Howard, and held that in consequence Howard could not have successfully asserted the fifth amendment privilege as to any of the documents had he retained them. The court therefore concluded that none of the documents were protected by the attorney-client privilege.
 
 
 25
 The district court's analysis was erroneous in two ways. First, the second prong of the Fisher test that the documents be privileged in the client's hands need not be satisfied for every document before an attorney-client privilege should be recognized as to it, but only for documents delivered by the client to the attorney which were not themselves created as communications to the attorney. Following Professor Wigmore, Fisher reasoned that to permit individuals to obtain fully informed legal advice, it is necessary to permit them to transfer relevant documents to their attorneys without losing any evidentiary privileges the documents might possess in their own hands. At the same time, documents created outside the attorney-client relationship should not be held privileged in the hands of the attorney unless otherwise privileged in the hands of the client, lest the client immunize incriminating evidence merely by depositing it with his attorney. This reasoning applies only to what Fisher loosely termed "preexisting" documents in Wigmore's more precise formulation, documents that did not come into existence as communications from the client to the attorney. 8 J. Wigmore, Evidence § 2307, at 599 (McNaughton rev.1961). Letters from the client to the attorney seeking legal advice, for example, and all documents created by the attorney that are within the normal ambit of the common-law attorney-client privilege therefore need not be tested for privilege in the client's hands.
 
 
 26
 Second, the district court's ruling that none of the summoned documents could have been privileged in Howard's hands was too broad, even as applied only to preexisting documents transferred by Howard to his attorneys. In interpreting the fifth amendment self-incrimination clause as applied to compelled production of documents and other tangibles, the Supreme Court has constructed two basic frameworks for analysis.[11] Fisher itself exemplifies one analysis: the privilege exists only when an individual "is compelled to make a testimonial communication that is incriminating" that is, only when the individual is compelled to affirm the truth of a statement which incriminates him. Fisher v. United States, 1976, 425 U.S. 391, 408, 96 S.Ct. 1569, 1579, 48 L.Ed.2d 39. Compliance with a documentary summons does not require affirmance of the truth of any representations made on the documents; hence, "the Fifth Amendment would not be violated by the fact alone that the papers on their face might incriminate" the summonee. Id. at 409, 96 S.Ct. at 1580. To be sure, Fisher recognized that compelled production of documents has some testimonial aspects; by compliance, the summonee concedes the existence of and his possession of the papers demanded, as well as his belief that the papers are those described in the summons. But Fisher held that the former aspect should be ignored as de minimis when, as in this case, there is no question as to the existence and location of the papers. Id. at 411-12, 96 S.Ct. at 1581; cf. In re Katz, 2 Cir. 1980, 623 F.2d 122. As to the latter aspect, both Fisher and our decision in United States v. Authement, 5 Cir. 1979, 607 F.2d 1129, 1131-32, imply that it should not be a ground for refusing to produce the documents as long as the fact of compliance with the summons is not introduced into evidence at the incriminated party's trial.[12] Under this analysis, none of the preexisting documents summoned here would have been privileged in Howard's hands, and hence none would be protected by the attorney-client privilege while in his attorney's hands.
 
 
 27
 Yet other Supreme Court decisions suggest that in addition to creating the above protection, the fifth amendment creates a zone of privacy which absolutely protects documents from production by summons or subpoena as long as they are in the hands of the owner. Indeed, this was the premise of Boyd v. United States, 1886, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746, the fountainhead of modern analysis of the self-incrimination clause. Though certain features of the case have been overruled, its core perception "that the seizure of a man's private books and papers to be used in evidence against him" is not "substantially different from compelling him to be a witness against himself" has been persistently reiterated, in dicta at least, up to the present day. Id. at 633, 6 S.Ct. at 534. See, e. g., Bellis v. United States, 1974, 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678; Couch v. United States, 1973, 409 U.S. 322, 330, 93 S.Ct. 611, 616, 34 L.Ed.2d 548; Schmerber v. California, 1966, 384 U.S. 757, 763-64, 86 S.Ct. 1826, 1831, 16 L.Ed.2d 908. The only major limitation on that principle ever accepted by the Court was to forbid its assertion by artificial entities and individuals acting as their representatives. E. g., Bellis v. United States, 1974, 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678; United States v. White, 1944, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542.
 
 
 28
 These two branches of fifth amendment analysis are not logically exclusive of each other. Nothing in Fisher suggests otherwise; the Court expressly found that the accountant's workpapers summoned there were not the taxpayer's papers and hence would be outside the absolute protection of the Boyd principle even if in the taxpayer's hands. 425 U.S. at 414, 96 S.Ct. at 1582. Historically, the two tests have coexisted. The rule that the fifth amendment does not protect against the compulsion of nontestimonial acts is almost as old as Boyd itself. See Holt v. United States, 1910, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021. In recent years, however, a dispute has arisen over the scope of the Boyd zone of protection for private papers. At least one court, impressed with the apparent anomaly of protecting the records of a business enterprise carried on by a proprietorship but not those of a corporation, partnership, or other artificial entity, has sought to draw content-based distinctions between "business" and "personal" papers, extending Boyd's protection only to the latter. In re Grand Jury Proceedings (United States), 1 Cir. 1980, 626 F.2d 1051, 1054 n.2. See also Developments in the Law Corporate Crime: Regulating Corporate Behavior Through Criminal Sanctions, 92 Harv.L.Rev. 1227, 1281-83 (1979). Support for this distinction might be found in Andresen v. Maryland, 1976, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627, which, in upholding a seizure of documents under a warrant, repeatedly stressed that the documents seized were business documents. 427 U.S. at 471, 474, 475, 477, 96 S.Ct. at 2743, 2745, 2746. Indeed, if Andresen did not draw such a distinction, arguably it altogether abolished the Boyd principle sub silentio, for its fifth amendment analysis looked solely to the existence of compelled testimonial communication. It is difficult to find a logical reason for applying the Boyd principle to subpoenaed documents and not documents taken in a search, as in Andresen. See Andresen v. Maryland, 1976, 427 U.S. 463, 484-92, 96 S.Ct. 2737, 2750, 49 L.Ed.2d 627 (Brennan, J., dissenting). The government asks us to embrace one or the other of these views.
 
 
 29
 This Court, however, has already rejected interpretations of Fisher and Andresen that would either limit the Boyd principle to non-business records or abolish it altogether. In re Grand Jury Proceedings (McCloy and Sussman), 5 Cir. 1979, 601 F.2d 162; In re Oswalt, 5 Cir. 1979, 607 F.2d 645; United States v. Hankins, 5 Cir. 1978, 565 F.2d 1344, clarified, 581 F.2d 431, cert. denied, 1979, 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457. However illogically, these cases by implication limit Andresen to documents taken in a search. See ICC v. Gould, 3 Cir. 1980, 629 F.2d 847; In re Grand Jury Investigation (Nino V. Tinari), 3 Cir. 1980, 631 F.2d 17; United States v. Helina, 9 Cir. 1977, 549 F.2d 713, 716 (dictum). See also Matz & Wilson, Obtaining Evidence for Federal Investigative Crime Prosecutions: An Overview and Analysis of Investigative Methods, 14 Am.Crim.L.Rev. 651, 661-670 (1977). We are bound by these cases. Their cumulative teaching is that any incriminating papers in the actual or constructive possession of an individual,[13] which he holds in his individual capacity, rather than in a representative capacity,[14] and which he himself wrote or which were written under his immediate supervision,[15] are absolutely protected by the Boyd principle from production by subpoena or equivalent process,[16] regardless of whether they are business-related or more inherently personal in content. The district court's ruling that none of the summoned papers could be protected by the self-incrimination clause from production in Howard's hands was therefore incorrect.
 
 
 30
 Nevertheless, many of the documents summoned here cannot be within the attorney-client privilege. Both preexisting documents and documents created in the course of the attorney-client relationship must fall within the common-law standards for attorney-client privilege to be protected under the Fisher test. But that privilege extends only to legal advice given by a lawyer. The summons to Davis requests the workpapers he produced in the course of preparing Howard's tax returns and the tax records upon which they were based. Neither category of documents is privileged, because although preparation of tax returns by itself may require some knowledge of the law, it is primarily an accounting service.[17] Communications relating to that service should therefore not be privileged, even though performed by a lawyer. Olender v. United States, 9 Cir. 1954, 210 F.2d 795, 805-06; Canaday v. United States, 8 Cir. 1966, 354 F.2d 849, 857. Some courts have suggested, to the contrary, that tax return preparation and tax advice is sufficiently "legal" in nature to trigger the privilege. See Colton v. United States, 2 Cir. 1962, 306 F.2d 633, 637, cert. denied, 1963, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499; see also Peterson, Attorney-Client Privilege in Internal Revenue Service Investigations, 54 Minn.L.Rev. 67, 91-97 (1969). These services, however, are typically performed by accountants, and since there is no accountant-client privilege under federal law, there is no doubt that the papers summoned here would not be privileged if Howard had had a professional accountant prepare his returns. Couch v. United States, 1973, 409 U.S. 322, 335, 93 S.Ct. 611, 619, 34 L.Ed.2d 548; Falsone v. United States, 5 Cir. 1953, 205 F.2d 734, cert. denied, 1953, 346 U.S. 864, 74 S.Ct. 103, 98 L.Ed. 375. It would make little sense to permit a taxpayer to invoke a privilege merely because he hires an attorney to perform the same task.[18] The summons to Davis must therefore be enforced in its entirety.
 
 
 31
 Many of the documents summoned from Orr similarly must relate to matters other than the giving of legal advice, and hence are outside the attorney-client privilege as well. Financial transactions between the attorney and client, including the compensation paid by or on behalf of the client (Items 1-4, 10 of the Orr summons) are not within the privilege except in special circumstances not present here. United States v. Finley, 5 Cir. 1970, 434 F.2d 596, 597; In re Grand Jury Proceedings (United States v. Jones), 5 Cir. 1975, 517 F.2d 666; In re Walsh, 7 Cir. 1980, 623 F.2d 489, 494-95; see also 2 J. Weinstein & M. Berger, Weinstein's Evidence P 503(a)(4)(02), at 503-32 n.1 (1980). An attorney who acts as his client's business advisor, or his agent for receipt or disbursement of money or property to or from third parties (Items 5-8), is not acting in a legal capacity, and records of such transactions are not privileged.[19] Colton v. United States, 2 Cir. 1962, 306 F.2d 633, 638, cert. denied, 1963, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499; Pollock v. United States, 5 Cir. 1953, 202 F.2d 281, 285-86, cert. denied, 1953, 345 U.S. 993, 73 S.Ct. 1133, 97 L.Ed. 1401. Federal and state tax returns and other reports filed with the government (Items 13, 14) are not confidential communications and hence are not privileged. Colton v. United States, 306 F.2d at 638. The summons to Orr was therefore properly enforced as to those items.
 
 
 32
 On the record before us, however, enforcement is not proper as to at least three items in the Orr summons. The government concedes that Howard's will (Item 11) is privileged, and the district court's order enforcing the summons is therefore reversed to that extent. Further proceedings are necessary to determine whether Items 9 and 12 preexisting records of business operations and financial statements of Howard and Poseidon Investments, Inc., a corporation controlled by Howard are privileged or not.[20] It is possible that some of those documents satisfy both prongs of the Fisher test. If those documents were in Howard's possession, any which he held in a representative capacity for Poseidon could not, of course, be privileged under the fifth amendment, and the summons should be enforced as to such documents. But any documents relating to Howard's own affairs would be within the Boyd principle. As to those documents, the record does not disclose the purpose of and circumstances surrounding their transfer from Howard to Orr. If the information contained in those documents is confidential and the transfer was made for the purpose of obtaining legal advice, they will be privileged in Orr's hands. We therefore vacate that part of the district court's order enforcing Items 9 and 12 of the Orr summons and remand for further proceedings, including an in camera inspection of the documents to the extent the district court considers it appropriate. See United States v. Johnson, 5 Cir. 1972, 465 F.2d 793.
 
 
 33
 The order enforcing the summons to Davis, No. 79-2630, is AFFIRMED. The order enforcing the summons to Orr, No. 80-1015, is AFFIRMED IN PART, REVERSED IN PART, AND VACATED AND REMANDED IN PART.
 
 
 
 [1]
 See Handbook for Special Agents P 383. (13), in 6 Internal Revenue Manual Administration (CCH) P 9781 (1980); 5 id. at P 9451.2(3)
 
 
 [2]
 The terms of Davis's summons require him to give testimony relating to Howard's tax liability and to produce the following documents in regard to Howard and various corporations in which Howard participated:
 
 
 [1]
 Cash receipts and disbursements journals, general ledgers, subsidiary ledgers, check stubs, cancelled checks, deposit tickets, bank statements, deposit and withdrawal slips, records of stock purchased and sold, records of loans, records of real estate purchased and sold, records of rental income, records of assets bought and sold (including but not limited to vehicles, airplanes and boats), records of accounts payable and receivable, records of notes payable and receivable, records of inventory, financial statements, corporate minute records of inventory, financial statements, corporate minute books, corporate stock books, and any other documents necessary to compute a correct tax liability for the above periods
 
 
 [2]
 Accountants' workpapers, analysis of records, schedules, correspondence, retained copies of drafts of federal income tax returns and any other documents regarding the preparation of income tax returns for ROBERT M. HOWARD and the other above-listed names during the period 1974 through 1978
 
 
 [3]
 Orr's summons requires him to produce the following documents pertaining to Howard, Poseidon Investments, Inc., and other enterprises:
 
 
 [1]
 Records of any loans made by you to the above-designated subjects during the period January 1, 1972 through December 31, 1977, such loan records to include, but not limited to, the following information:
 a. Date of the loan.
 b. Amount of the loan.
 c. Form in which the loan was made.
 d. Purpose of the loan.
 e. When the loan was repaid.
 f. Form in which the loan was repaid.
 g. Amounts and dates of repayment.
 
 
 [2]
 Records of any loans made by the above-designated subjects to you during the period January 1, 1972 through December 31, 1977, such loan records to include, but not limited, to the following information:
 a. When the loan was made.
 b. Amount of the loan.
 c. Form in which the loan was made.
 d. Purpose of the loan.
 e. When the loan was repaid.
 f. Form in which the loan was repaid.
 g. Amounts and date of any and all repayments.
 
 
 [3]
 Records of any cash gifts made during the above noted period by you to the above-designated subjects, such records to include, but not limited to, the following:
 a. Amount of the cash gift.
 b. When the cash gift was made.
 c. Identity of individual or individuals present when the gift was made.
 
 
 [4]
 Records of any cash gifts made to you during the above noted period by the above-designated subjects, such records to include, but not limited to, the following:
 a. Amount of the cash gift.
 b. Date of the cash gift to you.
 c. Identity of individual or individuals present when the gift was made.
 
 
 [5]
 Records showing the dates and amounts of any money or property received by you or placed under your custody or control, or received by or placed under the custody or control of a member of your law firm for or on behalf of the above-designated subjects during the period January 1, 1972 through December 31, 1977
 
 
 [6]
 Records showing the dates and amounts of any disbursements of money or property made by you, or made at your direction, or made by or at the direction of a member of your law firm, for or on behalf of the above-designated subjects during the period January 1, 1972 through December 31, 1977
 
 
 [7]
 Records of any real or personal property you or your law firm assisted the above-designated subjects in acquiring, holding or disposing of during the period January 1, 1972 through December 31, 1977, such records to include but not limited to the following:
 a. Stocks, bonds, certificates of deposit, cashier checks, money orders or other securities.
 b. Loans made by the above-designated subjects to others than yourself.
 c. Loans made to the above-designated subjects.
 d. Real estate.
 e. Airplanes, boats, yachts, automobiles and/or other personal property.
 f. Bank checking or savings accounts.
 g. Escrow accounts or funds.
 
 
 [8]
 Records pertaining to the establishment and maintenance or other transactions with any trust fund related to the above-designated subjects, such records to include but not limited to the following:
 a. Establishment and maintenance of the trust.
 b. Funds and properties flowing into and out of the trust.
 c. Federal and state income or other tax returns or reports prepared and/or filed.
 d. Accounting records.
 
 
 [9]
 Records pertaining to any business operations of the above-designated subjects, during the period January 1, 1972 through December 31, 1977 including, but not limited to such records as lease agreements, purchase agreements, sales agreements, mortgages, notes payable, notes receivable, accounts receivable, accounts payable, and accounting records for income, expenses, assets and liabilities of such business
 
 
 [10]
 Records showing the dates and amounts of all compensation paid to you or paid to your law firm by the above-designated subjects during the period January 1, 1972 through December 31, 1977
 
 
 [11]
 Records, including the final draft, pertaining to any will and/or codicils of ROBERT MORRIS HOWARD prepared and/or maintained by you or your law firm
 
 
 [12]
 Records pertaining to any summaries of financial activities and the financial situation of the above-designated subjects during the period January 1, 1971 through December 31, 1977, including but not limited to income statements, balance sheets or other financial statements
 
 
 [13]
 Retained originals or copies of any Federal or state income tax returns of the above-designated subjects
 
 
 [14]
 Retained copies or originals of any other state or Federal reports or forms including but not limited to franchise tax returns, sales tax returns, and/or personal property inventories of the above-designated subjects
 
 
 [4]
 We question whether Davis and Orr have standing to raise this claim, since the allegedly illegal search of Howard's residence did not violate their fourth amendment rights. See Rakas v. Illinois, 1978, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387. Furthermore, even if Howard had intervened in this enforcement action, as he undoubtedly had a right to do under 26 U.S.C. § 7609, and raised such a claim, we question whether it would be legally sufficient to defeat the summonses. As noted in the text of this opinion, the Supreme Court has frequently construed IRS summons procedure by analogy to grand jury subpoenas; and the fourth amendment does not prohibit a grand jury from using evidence seized during the course of an illegal search. United States v. Calandra, 1974, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561. The facts of this case make it unnecessary for us to consider the possibility that the statutes authorizing IRS summonses might be more restrictive in this respect than the fourth amendment requires. Cf. Gelbard v. United States, 1972, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179; United States v. Serubo, 3 Cir. 1979, 604 F.2d 807, 814
 
 
 [5]
 Orr argues that he was not allowed adequate discovery. This Court thoroughly analyzed the scope of required discovery in IRS summons enforcement proceedings recently in United States v. Harris, 5 Cir. 1980, 628 F.2d 875. Prehearing discovery is never required. After a hearing at which the issuing agent may be cross-examined, further discovery is within the discretion of the district court. Although Orr made prehearing requests for prehearing production of documents and issued subpoenas duces tecum to Martin and Fargo which were not complied with in full, he was given full opportunity to examine Martin and Fargo, and he did not clearly move for further discovery at the hearing. We need express no opinion on whether he should have been given any further discovery if it had been clearly demanded
 
 
 [6]
 "Special agents" are members of the Criminal Enforcement Division of the IRS. Civil tax assessment is the province of the Examinations Division; its agents are known as "revenue agents"
 
 
 [7]
 We note that there is no evidence that the IRS transmitted any information to the Drug Enforcement Administration in return, or that the summonses were directly inspired by the DEA; nor were IRS agents acting under the supervision of a joint task force attorney. Cf. United States v. Serubo, 3 Cir. 1979, 604 F.2d 807. Such cooperation between the IRS and other agencies may taint the institutional purpose of the IRS in issuing a summons, but not where communication between the agencies is strictly one way, as was apparently the case here. Cf. United States v. LaSalle National Bank, 1978, 437 U.S. 298, 317, 98 S.Ct. 2357, 2367, 57 L.Ed.2d 221 ("the good-faith standard will not permit the IRS to become an information-gathering agency for other departments ..."). See generally Note, The Institutional Bad Faith Defense to the Enforcement of IRS Summonses, 80 Colum.L.Rev. 621, 631-37 (1980); Fink, Internal Revenue Service Summons Power, 38 N.Y.U.Inst.Fed.Tax. § 19.03(2) (1980)
 
 
 [8]
 The appellants also assert that some of the documents seized in the search of Howard's residence and copied by Martin are identical with the records sought by the summonses, but nothing in the record so indicates
 
 
 [9]
 See also United States v. Davey, 2 Cir. 1976, 543 F.2d 996, 1000; United States v. Theodore, 4 Cir. 1973, 479 F.2d 749, 755; United States v. Lenon, 7 Cir. 1978, 579 F.2d 420, 422. In light of United States v. Pritchard, 5 Cir. 1971, 438 F.2d 969, however, we question whether this Court would have struck the balance between government convenience and potential for harassment in the same way the Seventh Circuit did on the facts of Lenon
 
 
 [10]
 Two circuits hold that the work product doctrine does apply in summons proceedings. See United States v. Amerada Hess Corp., 3 Cir. 1980, 619 F.2d 980, 987-88; United States v. Brown, 7 Cir. 1973, 478 F.2d 1038, 1040-41; see also United States v. Bonnell, D.Minn.1979, 483 F.Supp. 1070, 1078-79. One clearly holds that it does not. United States v. Upjohn Co., 6 Cir. 1979, 600 F.2d 1223, 1228 n.13, cert. granted, 1980, 445 U.S. 925, 100 S.Ct. 1310, 63 L.Ed.2d 758. Precedent in the Fifth Circuit is less than definitive. A strong dictum in United States v. McKay, 5 Cir. 1967, 372 F.2d 174, 176, doubts that the privilege can apply, while dictum in United States v. Hankins, 5 Cir. 1980, 632 F.2d 894, assumes that it can. See also United States v. Lipshy, N.D.Tex.1979, 492 F.Supp. 35. To the extent that the analogy between an IRS summons and a grand jury subpoena holds true, note that it is uniformly held that the work product doctrine applies to grand jury proceedings. The seminal case is In re Grand Jury Proceedings, 8 Cir. 1973, 473 F.2d 840. See also In re Grand Jury Subpoena, 6 Cir. 1980, 622 F.2d 933, 935; In re Grand Jury Investigation, 3 Cir. 1979, 599 F.2d 1224, 1228; In re Grand Jury Subpoena, 2 Cir. 1979, 599 F.2d 504, 509; Velsicol Chemical Corp. v. Parsons, 7 Cir. 1977, 561 F.2d 671, 679, cert. denied, 1978, 435 U.S. 942, 98 S.Ct. 1521, 55 L.Ed.2d 538. Cf. United States v. Nobles, 1975, 422 U.S. 225, 247 n.6, 95 S.Ct. 2160, 2174, n.6, 45 L.Ed.2d 141 (White, J., concurring)
 
 
 [11]
 See generally Note, Formalism, Legal Realism, and Constitutionally Protected Privacy Under the Fourth and Fifth Amendments, 90 Harv.L.Rev. 945 (1977)
 
 
 [12]
 Courts have differed over how to deal with the tacit authentication resulting from the summonee's implied affirmation that the papers delivered are the papers demanded. At least one Court has suggested that it might justify complete refusal to comply with the summons. In re Katz, 2 Cir. 1980, 623 F.2d 122, 125-26. Some seem to ignore it entirely. United States v. Praetorius, 2 Cir. 1980, 622 F.2d 1054, 1062-63; United States v. Osborne, 9 Cir. 1979, 561 F.2d 1334, 1339. One Court rejects our Authement principle as tantamount to a "judicial grant of immunity without statutory authorization", but permits compelled production as long as the government grants immunity against use of the fact of compliance. In re Grand Jury Proceedings (United States), 1 Cir. 1980, 626 F.2d 1051, 1057-58
 
 
 [13]
 See Couch v. United States, 1973, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548; United States v. Jones, 5 Cir. 1980, 630 F.2d 1073
 
 
 [14]
 See Bellis v. United States, 1974, 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678; United States v. White, 1944, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed.2d 1542
 
 
 [15]
 See Fisher v. United States, 1976, 425 U.S. 391, 414, 96 S.Ct. 1569, 1582, 48 L.Ed.2d 39; United States v. Beattie, 2 Cir. 1976, 541 F.2d 329
 
 
 [16]
 "Equivalent process" includes IRS summonses and, in general, any procedure which forces an individual to make any testimonial communication on pain of contempt. See I.C.C. v. Gould, 3 Cir. 1980, 629 F.2d 847, 860-61. It does not include search warrants. Andresen v. Maryland, 1976, 427 U.S. 463
 
 
 [17]
 Accounting services performed ancillary to legal advice may be within the attorney-client privilege. United States v. Kovel, 2 Cir. 1961, 296 F.2d 918. See also Federal Trade Commission v. TRW, Inc., D.C.Cir.1980, 628 F.2d 207. Preparation of tax returns may in some circumstances come within this category, as where a taxpayer's attorney has amended tax returns prepared after an IRS investigation into the originals has begun. See United States v. Cote, 8 Cir. 1977, 456 F.2d 142. This is not such a case. See generally 2 J. Weinstein & M. Berger, Weinstein's Evidence P 503(a)(1)(01) (1980)
 
 
 [18]
 In any case, Colton noted that since part of the information that passes between the attorney-accountant and client will be disclosed on the tax returns directly or indirectly, that part at least is not a confidential communication and hence is not privileged. 306 F.2d at 638. But disclosure of any significant portion of a confidential communication waives the privilege as to the whole. United States v. Cote, 8 Cir. 1972, 456 F.2d 142, 144-45; 8 J. Wigmore, Evidence § 2327, at 638 (McNaughton rev.1961)
 
 
 [19]
 This reasoning applies to item 8(b). Items 8(c) and 8(d) are unprivileged for other reasons set forth in the text. Documents establishing trust funds, requested by item 8(a), are not privileged because in their creation the attorney acts merely as a scrivener. See Pollock v. United States, 202 F.2d at 286; Canaday v. United States, 8 Cir. 1966, 354 F.2d 849, 857; 8 J. Wigmore, Evidence § 2297 (McNaughton rev.1961)
 
 
 [20]
 Blanket assertions of privilege before a district court are usually unacceptable. United States v. Hodgson, 10 Cir. 1974, 492 F.2d 1175, 1177; United States v. Roundtree, 5 Cir. 1969, 420 F.2d 845, 852. Although Orr made no attempt to demonstrate in any specific way that any particular documents fell within the ambit of the privilege, in the circumstances of this case there was enough confusion over the appropriate time to assert privilege that we will permit Orr to make the required showing on remand. Future litigants who make only blanket assertions of privilege at enforcement proceedings should not expect such grace